UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| BRANDY MADDEN, individually and as | ) | |
| natural mother and next friend to | ) | |
| C.T., a minor child, | ) | |
| | ) | |
| Plaintiff, | ) | 1:13-CV-377 |
| | ) | |
| v. | ) | Judge Curtis L. Collier |
| | ) | |
| HAMILTON COUNTY | ) | |
| DEPARTMENT OF EDUCATION, | ) | |
| | ) | |
| Defendant. | ) | |

# M E M O R A N D U M

Before the Court is Plaintiff Brandy Madden's motion for a new trial on her claim that Defendant Hamilton County Department of Education violated her minor daughter's Fourth-Amendment rights by searching the daughter's body for signs of congenital herpes. (Doc. 83.) Plaintiff argues the jury instructions were improper, the Court erred in excluding a certain document from evidence, and the Court coerced the jury into reaching a verdict. Defendant responded to Plaintiff's motion (Doc. 84), and Plaintiff replied (Doc. 85). For the reasons discussed below, the Court will **DENY** Plaintiff's motion.

## I. BACKGROUND

In August 2012, Plaintiff's five-year-old daughter, C.T., entered kindergarten at Apison Elementary School ("Apison") in Hamilton County, Tennessee. C.T. came within the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 *et seq.*, because of cerebral palsy. She was placed in a special education class with teacher Elizabeth Fleming.

As part of C.T.'s enrollment process, Plaintiff was asked to fill out a Health Management Authorization Form. In the section asking for all of C.T.'s health conditions, Plaintiff wrote only, "[S]he will not come if she is ill. Thanks. That's all you guys need to know. Thanks. Brandy Madden." (Pl.'s Ex. 2.) In the section asking for C.T.'s healthcare provider and providing consent to contact the listed healthcare provider, Plaintiff listed Dr. Arif Shafi.[1] (*Id.*) Defendant faxed Dr. Shafi a form requesting medical information on C.T. The form was returned in August with the following statement under "Health Conditions": "rash over lower extremities send child home." (*Id.*)

Although neither form mentioned congenital herpes, Ms. Fleming had been told in a transition planning meeting with C.T.'s preschool teacher in the spring of 2012 that C.T. had congenital herpes. The preschool teacher said C.T.'s shoes and socks should be kept on to avoid spreading the virus. In August 2012, Ms. Fleming told Sonya Neil, the school nurse at Apison, that she had heard C.T. had congenital herpes.

C.T. wore pullup diapers and was working on potty training when she was a student at Apison. Several times each day, Ms. Fleming or her assistant, Debbie Wells, would take C.T. to a large, private bathroom to change her pullups and give her an opportunity to use the toilet.[2] These changes would be initiated either by C.T., who would gesture or use a talking device to indicate her desire to be changed, or by one of the teachers, who would ask her every hour or two

---

[1] Although records from several years earlier indicated that Dr. Janara Huff had also treated C.T., Plaintif did not list Dr. Huff on the consent form.

[2] Other children in Ms. Fleming's class also required various degrees of help with toileting. While either Ms. Fleming or Ms. Wells took a child to the bathroom, the other would stay in the classroom with the remaining students.

Case 1:13-cv-00377-CLC-CHS   Document 92   Filed 08/09/16   Page 2 of 28   PageID #: 1822

whether she needed to be changed, or would sometimes just take her to the bathroom as part of a regular potty training routine.

Two school employees were present every time C.T., or any other child in need of toileting assistance, was taken to the bathroom. The second employee was sometimes a teacher or assistant from a nearby classroom. At other times, the second person was Nurse Neil, whose station was near the bathroom. Although the second person might help with lifting or changing the child at times, the primary reason for having a second person present was to have a witness for liability or safety purposes.

Once C.T. was taken to the bathroom, she would be lifted out of her wheelchair onto a changing table. Her pants would be pulled down so the used pullup could be removed. She would be placed on a potty chair to try to use the toilet. She would then be lifted back onto the changing table where her shoes and pants would be removed.[3] She generally wore ankle socks, which would sometimes come off along with her shoes or pants. She would be cleaned as necessary, with more extensive cleaning if she had had a bowel movement. A new pullup would be pulled on and her pants, socks, and shoes would be put back on before she was returned to her wheelchair to go back to her classroom. At times, C.T.'s clothes, including her shirt, would have to be changed because of soiling. Changes were also sometimes necessary because of spills while C.T. was eating or drinking.

---

[3] A used pullup, like a used diaper, could be opened and removed without completely removing C.T.'s pants. But her pants, and consequently her shoes, had to be completely removed to put on a new pullup because the pullup did not have material at the sides that could be refastened. Defendant's employees explained that while they sometimes referred to what C.T. was wearing as "diapers," C.T. almost always, in fact, wore pullups.

Around October 30, 2012, a special education instructor at Apison was incorrectly diagnosed with herpes of the eye. The teacher had previously been holding C.T. close to her face while C.T. had a fever and was crying. Nurse Neil attempted to contact Dr. Shafi to ask about C.T.'s herpes but did not receive a response.[4] Nurse Neil's supervisor, Defendant's nurse manager Sheryl Rogers, then contacted Dr. Stephen Adams, a family medicine physician who served as medical consultant to Defendant. After reviewing various of Defendant's policies and C.T.'s documents, Dr. Adams said Nurse Neil should check C.T. for a rash, consistent with Dr. Shafi's faxed instructions that C.T. should be sent home if she had a rash. Nurse Manager Rogers accordingly instructed Nurse Neil to check C.T.'s skin for signs of a herpes rash during C.T.'s regular changes. According to Nurse Manager Rogers's testimony, she instructed Nurse Neil not to remove any of C.T.'s clothes.

On November 7, 8, 9, and 12, 2012, Nurse Neil checked C.T.'s skin for signs of a rash or blisters once a day during one of C.T.'s regular pullup changes. While the toileting and change took place, Nurse Neil looked at the exposed portions of C.T.'s body, including her labial area, for rashes or blisters. Nurse Neil may have lifted C.T.'s shirt to see her back and front, or she may have only looked at C.T.'s torso to the extent C.T.'s shirt was lifted incidental to her pullup changes. Nurse Neil also lifted an eye patch C.T. was wearing at the time to see if there were signs of a rash or blister there.[5] She did not otherwise touch C.T. during these changes. Nurse Neil described the difference between these body checks and other times she witnessed diaper changes as paying closer attention to C.T.'s skin in order to assess it.

---

[4] Nurse Neil did not attempt to contact Plaintiff.

[5] Ms. Fleming had sent a question home to Plaintiff about C.T.'s eye patch but had not received a response.

On Monday, November 12, 2016, Nurse Neil saw a small blister on C.T.'s foot when C.T.'s sock came off with her pants as part of her pullup change. After various communications among Defendant's personnel, C.T. was sent home. On November 16, Defendant received a letter from Dr. Huff, C.T.'s infectious disease doctor, and ultimately allowed C.T. to return to school.

Plaintiff was upset by the fact that C.T. had been sent home and by the examinations that had taken place. According to Plaintiff, Nurse Neil described the examinations as strip searches and said they took place in Nurse Neil's office.

On November 12, 2013, Plaintiff, individually and as natural mother and next friend to C.T., filed a complaint under 42 U.S.C. § 1983 alleging Defendant violated C.T.'s Fourth Amendment right to be free from unreasonable searches and her Fourteenth Amendment right to privacy. (Doc. 1.) Plaintiff alleged Defendant was liable for having a policy or practice that led to the violation of C.T.'s constitutional rights. Before trial, the Court granted summary judgment to Defendant on Plaintiff's Fourteenth Amendment claim. (Doc. 43.)

Plaintiff filed proposed jury instructions on July 24, 2015. (Doc. 29.) She did not propose any instructions regarding a final-policymaking-official theory of liability. Although her instructions mentioned a failure-to-train theory of liability, she did not propose any instructions on the specific elements of such a claim.

A jury trial on Plaintiff's Fourth Amendment claim began on Monday, August 17, 2015. (Doc. 66.) During the trial, Nurse Manager Rogers testified that she provided her nurses with training twice a year on the Tennessee Guidelines for Health Care Professionals in a School

Setting (the "Tennessee Guidelines"),[6] various school policies, and a school health manual, which Nurse Manager Rogers updated several times each year. Subjects of the training included the confidentiality of students' health care information and guidance regarding the protection of students' privacy. The training specified that nurses were never to disrobe a student.

The Court did not allow the introduction of either version of the Tennessee Guidelines as an exhibit because they were, in effect, regulations. The Court did, however, allow the parties to ask the witnesses questions about the Tennessee Guidelines. The Court also invited Plaintiff to submit an instruction regarding the contents of the Tennessee Guidelines. Plaintiff did not do so.

Although both parties had stated in their respective proposed final pretrial orders that the trial would last three days (Docs. 61, 63), Plaintiff's presentation of evidence continued into Wednesday afternoon, the third day of trial, and Defendant's evidence was presented on Wednesday afternoon and Thursday morning (Docs. 66–68, 74).

The Court provided its proposed jury instructions to the parties for review before the lunch break on Thursday, August 20, and conducted the charge conference that afternoon outside the presence of the jury. After the charge conference, the Court provided a revised version of the charge to the parties. Among other changes, the revised charge removed all mention of a final-policymaking-official theory of liability. Plaintiff requested certain small changes to the revised charge, which the Court made. Plaintiff did not object to the removal of the final-policymaking-official instructions.

The parties then made their closing arguments and the Court charged the jury, concluding shortly before 5:00 p.m. on Thursday. After being told that the Court would not require them to

---

[6] There was a 2007 edition of the Tennessee Guidelines and a 2014 edition. The 2007 edition was in effect at all times relevant to this case.

stay past 5:00 p.m., the jury declined the option to begin deliberations that afternoon and were released for the day at 4:50 p.m. (Doc. 74.)

The jury began deliberations at 9:10 a.m. on Friday, August 21. (Doc. 75.) At 3:25 p.m., the jury returned a verdict for Defendant. The jury was polled at Plaintiff's request. When asked if the verdict was their verdict, two of the jurors said "no." Plaintiff moved for a mistrial. The Court denied the motion, sending the jury back to continue deliberations at 3:30 p.m. At 3:45 p.m., the jury again returned a verdict for Defendant. When polled regarding the second verdict, all jurors stated that this verdict was their verdict. The jury was discharged at 3:54 p.m. (*Id.*) Plaintiff's motion for a new trial followed.

## II.    <u>LEGAL STANDARD</u>

Under Rule 59, the Court may grant a new trial only "when a jury has reached a 'seriously erroneous result' as evidenced by[] (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, *i.e.* the proceedings being influenced by prejudice or bias." *Mike's Train House, Inc. v. Lionel, LLC*, 472 F.3d 398, 405 (6th Cir. 2006) (alteration in original) (quoting *Holmes v. City of Massillon*, 78 F.3d 1041, 1045–46 (6th Cir. 1996)). The Court, however, is "not free to reweigh the evidence or set aside the jury verdict merely because the jury could have drawn different inferences or conclusions." *Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815, 821 (6th Cir. 2000) (quoting *Duncan v. Duncan*, 377 F.2d 49, 52 (6th Cir. 1967)).

III.    **DISCUSSION**

Plaintiff argues she is entitled to a new trial on her Fourth-Amendment claim on three grounds. First, Plaintiff argues the jury instructions were improper and misleading to the jury. Second, she argues the Court erred in excluding the 2007 Tennessee Guidelines from evidence. Third, she argues the Court coerced the jury into reaching a verdict by sending the jury back for further deliberations after two jurors stated during the first poll that the verdict in favor of Defendant was not their verdict.

A.      **Jury Instructions**

Jury instructions should "adequately inform the jury of the relevant considerations and 'provide a basis in law for aiding the jury in reaching its decision.'" *Romanski v. Detroit Entm't, LLC*, 428 F.3d 629, 641 (6th Cir. 2005) (quoting *Argentine v. United Steelworkers of Am., AFL-CIO*, 287 F.3d 476, 484 (6th Cir. 2002)).

Procedurally, a trial court "must inform the parties of its proposed instructions . . . before instructing the jury and before final arguments." Fed. R. Civ. P. 51(b)(1). The court must "give the parties an opportunity to object on the record and out of the jury's hearing before the instructions and arguments are delivered." *Id.* at (b)(2). Any objection must be made "on the record, stating distinctly the matter objected to and the grounds for the objection." *Id.* at (c)(1). An error in an instruction actually given to the jury is preserved for review if the party properly objected to the instruction. *Id.* at (d)(1)(A). An error in failing to give an instruction is preserved for review if the "party properly requested it and—unless the court rejected the request in a definitive ruling on the record—also properly objected." *Id.* at (d)(1)(B). An error not properly preserved may be considered if the error is plain and it affects substantial rights. *Id.* at (d)(2).

8

"A district court's refusal to give a jury instruction constitutes reversible error if (1) the omitted instruction is a correct statement of the law, (2) the instruction is not substantially covered by other delivered charges, and (3) the failure to give the instruction impairs the requesting party's theory of the case." *Cummins v. BIC USA, Inc.*, 727 F.3d 506, 510 (6th Cir. 2013) (quoting *Taylor v. TECO Barge Line, Inc.*, 517 F.3d 372, 387 (6th Cir. 2008)). A jury verdict may be set aside based on incorrect jury instructions "only when the instructions, viewed as a whole, [are] confusing, misleading, or prejudicial." *Bridgeport Music, Inc. v. UMG Recordings, Inc.*, 585 F.3d 267, 274 (6th Cir. 2009) (alteration in original; internal quotation marks omitted) (quoting *Romanski*, 428 F.3d 629 at 641).

Plaintiff proposed the following instruction on her claim under 42 U.S.C. § 1983:

> In order to prevail on her § 1983 claim against defendant Hamilton County Department of Education alleging liability based on a policy of failure to train its employees, the plaintiff must prove by a preponderance of the evidence that the defendant Hamilton County Department of Education was deliberately indifferent to the obvious consequences of its failure to train its employees adequately. A preponderance of the evidence means it is more likely than not.

(Doc. 29 at 3 (footnotes omitted; citing *City of Canton v. Harris*, 489 U.S. 378 (1989) and Tennessee Pattern Instruction – Civil 2.40).) Plaintiff did not propose any instructions on the elements of a failure-to-train claim or on what "deliberately indifferent" means. Plaintiff also did not propose any instructions mentioning a final-policymaking official.

Plaintiff now argues the Court's "official policy or custom" jury instructions were improper in two ways: they did not include any instruction on a final-policymaking-official theory of liability, and they contained incorrect elements on Plaintiff's failure-to-train theory. Plaintiff also argues the Court's instructions on the existence of a search, consent to any search, and the reasonableness of any search misled the jury.

9

1.      **"Official Policy or Custom" Instructions**

Although local governmental bodies can be sued under 42 U.S.C. § 1983, they cannot be held vicariously liable for their employees' actions under a *respondeat superior* theory. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Rather, they can be held liable only when an official policy or custom "'causes' an employee to violate another's constitutional rights." *Id.* at 692. A plaintiff may show the existence of such an official policy or custom by taking one of at least four avenues: "(1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Spears v. Ruth*, 589 F.3d 249, 256 (6th Cir. 2009) (quoting *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)). Plaintiff's motion implicates the second, third, and fourth of these theories.

a.      **Final-Policymaking-Official Theory**

Plaintiff argues that the omission of an instruction on a final-policymaking-official theory of liability (the second avenue for showing an official policy or custom set forth above) impaired her theory of the case. Plaintiff points out that the Court's initial draft of the jury charge included instructions on a final-policymaking-official theory of liability, but the final charge omitted all reference to a final-policymaking official. Plaintiff argues the jury should have been instructed that if Nurse Manager Rogers was a final-policymaking official as to the search of C.T., Defendant would have been liable if Nurse Manager Rogers directed, authorized, or agreed to a violation of C.T.'s Fourth Amendment rights.

Defendant responds that Plaintiff did not develop any proof at trial as to a final-policymaking-official theory, relying instead on the theory that Defendant had no policy on the

10

subject at all. Defendant asserts Plaintiff did not question Nurse Manager Rogers as to whether she would satisfy the definition of a final-policymaking official. Defendant speculates Plaintiff made this choice because of testimony from Nurse Manager Rogers and Nurse Neil that Nurse Manager Rogers never directed Nurse Neil to conduct a strip search of C.T. Finally, Defendant points out that Plaintiff did not object to the final instructions when given a chance to do so before the final charge.

The omission of a final-policymaking-official theory of liability did not impair Plaintiff's theory of the case. Plaintiff's own proposed jury instructions did not mention a final-policymaking-official theory (Doc. 29). Moreover, and somewhat unexpectedly to the Court, Plaintiff's counsel affirmatively stated during argument on Defendant's oral motion for judgment as a matter of law that Plaintiff was arguing only the *lack* of a policy, not the *existence* of a policy. During the charge conference, the Court referenced Plaintiff's disclaimer of any argument based on the existence of a policy and discussed with the parties its intention to remove from the instructions the language dealing with a final-policymaking-official theory. Plaintiff agreed with this approach during the charge conference. Among other things, the Court stated its intention to alter the section of the draft instructions titled "Fourth Element – Official Policy or Custom" by removing subsection one (1), which addressed a final-policymaking official, and replace that section with what ultimately appeared in the jury instructions under the heading "Fourth Element – Lack of Official Policy." Although Plaintiff now quotes the removed language in her motion (*see* Doc. 83 at 2), both parties stated this change was agreeable during the charge conference. Finally, Plaintiff did not object to the omission of the final-policymaking-official language after the revised draft was distributed to counsel for final review before the Court gave the charge to the jury.

11

In sum, Plaintiff did not properly object to the omission of an instruction a final-policymaking-official theory of liability, and its omission did not impair Plaintiff's theory of the case.

### b.    Inadequate-Training Theory

Plaintiff next argues that the Court's instructions contained the elements for an inaction theory rather than an inadequate-training theory, and these two sets of elements are "vastly different." (Doc. 85 at 4.)  Plaintiff states her theory was inadequate training (the third avenue for showing an official policy or custom), and she argues the Court provided an incorrect standard for the jury to follow by using elements for an inaction theory (the fourth avenue). Defendant responds that the elements in the instructions were correct, and the main theory on which Plaintiff developed proof was, in any event, an inaction theory.

A § 1983 claim "is at its most tenuous where [it] turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).  Simply showing that additional training "would have been helpful in making difficult decisions" is not enough.  *Id.* at 68.  Nor is it enough to show that an injury could have been avoided through better or different training.  *Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 391 (1989)).  A failure to train can be the basis for liability only where the failure amounts to deliberate indifference to the rights of the people with whom the untrained or inadequately trained employee comes into contact.  *City of Canton*, 489 U.S. at 387–88. Deliberate indifference is "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."  *Bd. of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 410 (1997).

A plaintiff proceeding on a failure-to-train theory must prove three facts: "[the] training program is inadequate to the tasks that the [employees] must perform"; "the inadequacy is the

result of *the [municipality's] deliberate indifference*"; and "the inadequacy is 'closely related to' or 'actually caused' the plaintiff's injury." *Hill v. McIntyre.*, 884 F.2d 271, 275 (6th Cir. 1989) (emphasis added) (quoting *City of Canton*, 489 U.S. at 389–90). There are two ways, in turn, by which a plaintiff may show deliberate indifference: a pattern of violations or a single incident. *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700–01 (6th Cir. 2006).

Ordinarily, a plaintiff must show a pattern of similar constitutional violations in the face of which the municipality has continued its failure to train. *Connick*, 563 U.S. at 62. "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have *deliberately chosen* a training program that will cause violations of constitutional rights." *Id.* (emphasis added).

Sometimes, however, a plaintiff may show that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [municipality] can reasonably be said to have been deliberately indifferent to the need" for more training even in the absence of prior similar violations. *City of Canton*, 489 U.S. at 390. Single-incident liability exists in a narrow range of circumstances and is the exception, rather than the rule, for showing deliberate indifference in a failure-to-train case. *Connick*, 563 U.S. at 71–72. It may exist where a violation of federal rights is "a highly predictable consequence of a failure to equip [employees] with specific tools to handle recurring situations." *Bd. of Comm'rs of Bryan Cty.*, 520 U.S. at 409. The Supreme Court described as an example a situation in which policymakers "know to a moral certainty that their police officers will be required to arrest fleeing felons" and sends those police officers out into the city with firearms, but fails to provide any training on the limitations the Constitution places on the use of deadly force. *City of Canton*, 489 U.S. at 390 n.10.

13

Inaction, or a "custom of tolerance or acquiescence of federal rights violations," is the fourth avenue listed in *Spears* to prove an official policy or custom. 589 F.3d at 256. Under this theory, a plaintiff must show (1) a clear and persistent pattern of illegal activity; (2) notice or constructive notice of the pattern by the defendant; (3) the defendant's tacit approval of unconstitutional conduct, so that the defendant's deliberate indifference amounts to an official policy of inaction; and (4) the custom was the moving force for or direct causal link to the constitutional violation. *Thomas*, 398 F.3d at 429 (citing *Doe v. Claiborne Cty.*, 103 F.3d 495, 508 (6th Cir. 1996)).

Although the four avenues for proving an official policy or custom are listed separately, they are not necessarily mutually exclusive. In other words, while a plaintiff need only satisfy one of the four theories, there may still be conceptual overlap among them. Thus, for example, the analysis of a failure-to-train claim may depend in part on the analysis of an inaction case. *See Ellis*, 455 F.3d at 701 (conclusion on failure-to-train claim involving two prior relevant incident reports was compelled in part by decision in inaction case involving a lack of testimony on what would constitute a normal number of incidents).

Plaintiff argues the first two paragraphs of the Court's instruction on inadequate training were correct, but the subsequent numbered elements misled the jury because they were for an inaction theory, not a failure-to-train theory. The relevant instruction began as follows:

### FOURTH ELEMENT – LACK OF OFFICIAL POLICY

If you find that C.T. was deprived of her constitutional right to be free from unreasonable searches, Defendant is liable for that deprivation only if Plaintiff proves by a preponderance of the evidence that Defendant's lack of an official policy caused the deprivation. Plaintiff alleges that the absence of a Hamilton County Department of Education policy governing how and when to conduct searches led to the alleged Fourth Amendment violation. It is not enough for Plaintiff to show that Defendant employed a person who violated C.T.'s

14

rights. Plaintiff must show that the violation resulted from Defendant's lack of an official policy.

To establish this, Plaintiff must show that Defendant was deliberately indifferent to the fact that a violation of the right to be free from unreasonable searches in circumstances similar to the facts of this case was a highly predictable consequence of the failure to adopt a needed policy. "Deliberate indifference" occurs when a defendant exhibits a conscious disregard for the known and obvious consequences of not having a needed policy. That is, Plaintiff must show that, in light of the duties assigned to school employees, the need for a policy governing the employees' conduct is so obvious—and the inadequacy so likely to result in the type of Fourth Amendment violation alleged here—that Defendant can reasonably be said to have been deliberately indifferent to the need.

Specifically, to show that the violation resulted from Defendant's lack of an official policy, Plaintiff must establish the following:

(1) the existence of a pattern of Fourth Amendment violations;

(2) notice, or constructive notice, on the part of Defendant;

(3) Defendant's tacit approval of the Fourth Amendment violations, such that the deliberate indifference in its failure to act can be said to amount to an official policy of inaction; and

(4) Defendant's policy was the "moving force" or direct causal link to activity violating the Fourth Amendment.

(Jury Instrs. at 22–23.)

Instead of the four numbered elements above, Plaintiff argues the Court should have included the following three elements:

(1) the training or supervision was inadequate for the tasks performed;

(2) the inadequacy was the result of the municipality's deliberate indifference; and

(3) the inadequacy was closely related to or actually caused the injury.

(Doc. 85 at 3–4 (quoting *Ellis*, 455 F.3d at 700).)

There are three significant problems with Plaintiff's argument. First, Plaintiff did not properly request these elements under Rule 51 or properly object to their omission. They were not in her proposed jury instructions, nor did she request them during the charge conference.[7] She did not even propose these elements after the Court distributed its revised draft of the charge. The first time she proposed these elements and referred the Court to *Ellis*, in fact, was in her *reply* in support of her motion for a new trial.

Second, the elements now suggested by Plaintiff do not provide complete instructions on an inadequate-training claim. *See Ellis*, 445 F.3d at 700. While correct as far as they go, they do not address the ways in which the second element—deliberate indifference—must be satisfied: either a pattern of violations or, in a narrow set of circumstances, single-incident liability. *See Ellis*, 455 F.3d at 700–01; *Connick*, 563 U.S. at 71–72. The formulation of elements Plaintiff now proposes would be appropriate only if Plaintiff had presented the jury with facts sufficient to entitle her to an instruction on single-incident liability. More practically, Plaintiff's proposed instructions could only have led to a different verdict if she had presented any evidence from which a rational jury could conclude that the need for more or different training of Defendant's personnel was *so* obvious, and the training inadequacy was *so* likely to lead to a constitutional violation, that Defendant must have been deliberately indifferent to the need for more training.

She did not do so. Unlike the example of a municipality sending armed police officers out to capture fleeing felons without training them in acceptable uses of deadly force, here there is neither a known frequency with which a difficult situation will occur nor a high probability that an employee in such a situation will violate a child's rights. This case involves an unusual

---

[7] Instead, Plaintiff referred the Court to *Connick*, 563 U.S. 51, a case which did not include her proposed elements and in which the Supreme Court found single-incident liability to be inapplicable.

combination of facts: a student in regular need of toileting assistance from the school who also had a communicable disease about which the school had insufficient information. It is hard, in fact, to describe the additional training that could have been designed, in advance, to give guidance in this situation.[8] Simply put, nothing removes Plaintiff's case from the ordinary one, in which a failure-to-train claim must include proof of a pattern of violations to establish deliberate indifference.[9]

Plaintiff also did not show that any inadequacy in Defendant's training was likely to result in the violation of students' constitutional rights. It is "far from obvious whether in fact there is" a constitutional right for a student not to be subjected to a visual assessment by a school nurse for medical, as opposed to law-enforcement related, purposes. *Hearring v. Sliwowski*, 712 F.3d 275, 279 (6th Cir. 2013) (reversing trial court's denial of summary judgment based on qualified immunity after a nurse asked a six-year-old student to pull down her pants and underwear so the nurse could check for redness after the student made repeated complaints of pain during urination) (quoting *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). In this case, C.T. was, with Plaintiff's consent, taken to a bathroom with a second adult several times a day where she was generally placed on a toilet, had her pants and shoes removed, cleaned, and had a new pullup put on. On the days in question here, the second adult—a nurse who had observed

---

[8] Defendant's training of its nurses already included instructions not to disrobe students. While a reasonable jury could have found Nurse Neil violated those instructions to the extent she lifted C.T.'s eye patch, lifted her shirt, or even disrobed her completely, according to Plaintiff's testimony about what Nurse Neil previously said, Defendant can be held liable under § 1983 only for its own constitutional violations, not vicariously liable for its employee's actions.

[9] As Plaintiff states, she did not introduce evidence of a pattern of similar constitutional violations, and therefore could not be expected to prevail on that theory. This does not change the fact that Plaintiff's case did not entitle her to the exceptional single-incident instruction rather than an instruction consistent with a general case.

17

those changes before—looked more closely at C.T.'s skin than she had on previous occasions, lifted an unexplained eye patch to check C.T.'s eye, and may have lifted C.T.'s shirt to see her torso. It cannot be said that a constitutional violation was "a highly predictable consequence" of Defendant's alleged failure to train. *See Bd. of Comm'rs of Bryan Cty.*, 520 U.S. at 409.

Third, the Court's charge as delivered substantially covered the elements of a failure-to-train claim in a case in which single-incident liability is not appropriate. Plaintiff claims, without explanation, that the two sets of elements are "vastly different." On the contrary, both sets of elements instruct on deliberate indifference and causation, and instruction on a pattern of violations was, as discussed above, necessary here. The Court finds no grounds for a new trial in Plaintiff's argument on the failure-to-train instructions.

### 3. Instruction on the Existence of a Search

Plaintiff objects to the following italicized language within the instruction on whether or not Defendant's employees conducted a "search" of C.T.:

> You have heard evidence that Defendant's personnel routinely changed C.T.'s clothing and cleaned the child's body. These actions were performed in accordance with Defendant's responsibility to maintain the health, safety, and hygiene of the child and *pursuant to the authorization and consent of Plaintiff.* These actions do not constitute a search under the Fourth Amendment. For there to be a search under these circumstances requires that the employees exceeded the scope of what they routinely did in changing the child's clothing and cleaning the child's body.

(Jury Instrs. at 16 (emphasis added).) Plaintiff argues the words "pursuant to the authorization and consent of Plaintiff" are misleading because Plaintiff never gave her consent to a medical examination. Plaintiff also argues this instruction conflicts with the next section, which instructed the jury on how to determine if there was consent to the examinations Defendant performed for signs of herpes on C.T.'s skin.

18

The search instruction was not misleading to the jury. It accurately instructed the jury that Defendant had Plaintiff's consent to change C.T.'s diapers as needed, change her clothes when she spilled on herself, and clean her as necessary in connection with both types of changes. Plaintiff's argument, by contrast, blurs the lines between whether she consented to Defendant's changing C.T. and whether she consented to Defendant's checking C.T.'s skin for signs of herpes. Plaintiff indisputably gave the first type of consent—if not expressly, then by implication—when she sent a child who was not potty trained and could not attend to her own toileting needs to school for a full day, day after day.[10] Whether she gave the second type of consent was, as Plaintiff concedes, properly addressed in the section of the instructions on consent. The instructions as given appropriately distinguish between the consent given to changing and cleaning C.T. and the disputed issue of consent to checking C.T. for herpes symptoms.

### 4. Instruction on Consent

Plaintiff objects to the following italicized language within the instruction on whether or not Plaintiff consented to any search of C.T.:

> Considering the child's age, condition, state of development, and ability to tend to her personal needs and hygiene, you must consider what would have been Plaintiff's reasonable expectation in having her child placed in Defendant's custody. That placement in Defendant's custody necessarily entails some degree of undressing the child and *close examination of the child's body*. You may consider this in determining what consent Plaintiff gave to Defendant's personnel and the extent of any such consent.
>
> Even if you determine that Plaintiff gave consent, there may still be a Fourth Amendment violation if Defendant's personnel exceeded the scope of that consent.

---

[10] Potty training was one of C.T.'s goals at school, and Plaintiff sent clean pullups to school for C.T. There were also routine communications from Ms. Fleming to Plaintiff regarding C.T.'s toileting activities.

19

(*See* Jury Instrs. at 17 (emphasis added).)  Plaintiff argues that the italicized phrase misled the jury into believing that consent to cleaning incidental to a diaper change is the same as consent to "close examination of [C.T.'s] body for herpes lesions."  (Doc. 83 at 11.)  Plaintiff also argues the Court failed to convey the critical distinction between "[l]ooking at parts of a child's body for hygiene purposes during a diaper change" and "an examination of a child's entire body for herpes lesions," asserting "the record is crystal clear that . . . [Nurse] Neil . . . examined all parts of [C.T.'s] body and skin."  (Doc. 83 at 11.)

As explained above regarding the existence of a search, the instructions as given appropriately distinguish between Plaintiff's consent to C.T.'s being changed and cleaned and the disputed question of whether Plaintiff consented to C.T.'s being checked for herpes symptoms.  Plaintiff fails to explain the alleged "critical distinction" between looking at a child's skin for signs of soiling and looking at a child's skin for signs of herpes.[11]

The instruction, moreover, states that the jury could consider whether Defendant's employees exceeded the scope of any consent Plaintiff gave.  As the Court explained to Plaintiff during the charge conference, the instruction needed to include two aspects of what Plaintiff reasonably should have expected in sending C.T. to school with toileting needs: both that the employee changing C.T. would have to do certain physical things, such as lifting, changing, and cleaning C.T., and that the employee would have to use her eyes to guide her hands in doing those things.  The Court engaged in a colloquy with the parties to develop language Plaintiff would prefer but that would still address the fact that a diaper change includes looking at the diaper area and elsewhere for cleaning purposes.  Plaintiff, instead, maintained her position that a

---

[11]  And contrary to Plaintiff's assertion, the evidence at trial was most certainly not "crystal clear" that Nurse Neil examined *all* parts of C.T.'s body.

person need barely look at a child's diaper area to clean the child after the child urinates or has a bowel movement in a diaper or pullup. Plaintiff points to no testimony in support of this position, however, and it defies common sense. The Court finds there was nothing confusing or misleading in this instruction to the jury.

### 5. Instruction on Reasonableness of Search

Plaintiff objects to the following portion of the Court's instruction on whether any search that occurred was reasonable: "In determining the reasonableness of Defendant's employees' actions in this case, you may consider the *health, hygiene, or medical reasons* for those actions." (Jury Instrs. at 19 (emphasis added).) Plaintiff asserts the reference to "health, hygiene, or medical reasons" is misleading. She states both of C.T.'s doctors testified there was no "medical" reason to look for herpes lesions on C.T. She also states there was no "health" reason to look for herpes lesions on C.T. because C.T. was taking medicine and had covered the lesions, "and that was the extent of what could have been done to help her health as it related to herpes lesions." (Doc. 83 at 11.) Defendant responds that Plaintiff overlooks other health, hygiene, or medical reasons for Defendant's employees' actions, and notes that the instruction is permissive, rather than mandatory.

This instruction is not misleading in the context of the instructions as a whole. Plaintiff relies on testimony that C.T. was taking medication, had her lesions covered, and needed no further treatment at the time. But at that time, Defendant knew none of this. Plaintiff had declined to provide any specific information to the school regarding C.T.'s congenital herpes or that she was on medication, saying that all Defendant needed to know what that C.T. would not go to school if she were sick. Dr. Shafi had also not informed the school that C.T. was taking medication or what her likelihood of contagion would be during an outbreak. It was reasonable

for the jury to consider the reasonableness of Defendant's actions in light of the information Plaintiff and C.T.'s doctor had chosen to provide to Defendant at the time in question.

Plaintiff also focuses only on possible reasons for the search relating to C.T.'s care. It was also permissible, however, for the jury to consider Defendant's reasons as they related to the health, hygiene, or medical needs of others. Dr. Shafi had instructed the school to send C.T. home if there was a rash over her lower extremities. Given that a teacher who had been in contact with C.T. was believed to have contracted herpes of the eye, and given Nurse Neil's lack of success in reaching Dr. Shafi for instructions, it was appropriate for the jury to consider testimony regarding Defendant's concern for the health, hygiene, and medical needs of other students and staff in determining the reasonableness of Defendant's actions. The Court finds this instruction was not confusing or misleading to the jury.

### B.      Exclusion of the 2007 Tennessee Guidelines

Plaintiff argues she was prejudiced by the Court's exclusion from evidence of the 2007 Tennessee Guidelines which, according to Plaintiff, both parties agreed should have been entered into evidence. Plaintiff argues the 2007 Tennessee Guidelines required Defendant to get "parental authorization and doctor's orders to perform a medical procedure, which was the medical examination of the child's skin for herpes lesions." (Doc. 83 at 12.) Plaintiff wanted to enter the document into evidence to show inadequate training by Defendant, in that Nurse Manager Rogers testified she used the document for training purposes. Plaintiff also wanted to enter the document into evidence to show Defendant acted unreasonably by searching C.T. for herpes lesions without parental authorization or a doctor's order.

Defendant responds that it, not Plaintiff, sought to introduce the 2007 Tennessee Guidelines into evidence, while Plaintiff sought to introduce the 2014 Tennessee Guidelines.

Defendant further responds that the parties never agreed which set of Guidelines would be appropriate. Defendant then argues that any error in excluding the 2007 Tennessee Guidelines was harmless, because the Court allowed testimony from multiple witnesses about the contents and use of the Tennessee Guidelines. Defendant states it elicited testimony from Nurse Manager Rogers about how she used the Tennessee Guidelines in training school nurses, and Plaintiff's failure to cross-examine on that issue does not require a new trial.

"Unless justice requires otherwise, no error in admitting or excluding evidence . . . is ground for granting a new trial . . . . At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights." Fed. R. Civ. P. 61. Plaintiff must therefore show two things in order to justify a new trial on the grounds of judicial error. First, Plaintiff must show the Court actually acted erroneously in making a ruling. Once error has been established, Plaintiff must show the error prejudiced the proceedings in a substantive way. "Broad discretion is given to district courts in determinations of admissibility based on considerations of relevance and prejudice, and those decisions will not be lightly overturned." *Tompkin v. Philip Morris USA, Inc.*, 362 F.3d 882, 897 (6th Cir. 2004) (quoting *United States v. Jackson–Randolph,* 282 F.3d 369, 376 (6th Cir. 2002)).

The Court did not allow the introduction of either version of the Tennessee Guidelines as an exhibit because they were, in effect, regulations. The Court did, however, allow the parties to ask the witnesses questions about the Tennessee Guidelines, and several sections were read into evidence. Both Nurse Neil and Nurse Manager Rogers testified to the effect that looking at C.T.'s skin for signs of herpes may have been a medical assessment, but it was not a "medical procedure" as defined in the Tennessee Guidelines and it therefore did not require authorization from a parent or a doctor. There was also testimony that the mere fact that an interaction

23

involves a licensed health care professional does not transform that interaction into a medical procedure, and that the Tennessee Guidelines do not apply to a body check or observation.

The excerpt of the 2007 Tennessee Guidelines Plaintiff submitted in support of her motion is consistent with this conclusion. That excerpt requires parental permission or a doctor's orders before a licensed health care professional, such as a nurse, performs a health care procedure, but it defines a procedure as "a specific treatment." (Doc. 83-3 at 3.) Plaintiff presented no evidence that merely looking at a child for a medical purpose is a "specific treatment." The same section of the Tennessee Guidelines in fact distinguishes activities of daily living, such as toileting, bathing, diapering, and dressing, which do not require a physician's orders or parental consent.

Even if the Court erred in excluding the Tennessee Guidelines, Plaintiff is not entitled to a new trial on this ground because it did not affect Plaintiff's substantial rights under Rule 61. The jury heard testimony regarding the contents of the Tennessee Guidelines. It is unlikely that admitting the Tennessee Guidelines themselves would have changed the outcome of the trial, as testimony about the contents of the Tennessee Guidelines did not do so. *See Cotton v. City of Franklin*, 494 F. App'x 518, 525–26 (6th Cir. 2012) (exclusion of email not reversible error when jury was familiar with the contents of the email and the plaintiff's perceptions of the intentions behind the email).

Finally, the Court invited Plaintiff to submit an instruction regarding the contents of the Tennessee Guidelines. Plaintiff did not do so, and she is not now entitled to a new trial on the grounds that the jury should have been more informed about the contents of the Tennessee Guidelines.

## C. Coercion of the Jury

Plaintiff claims the Court coerced the jury into reaching a verdict by sending the jury back to deliberate further after two jurors stated during the first poll that the verdict was not their verdict. She alleges this occurred "just prior to 5:00 p.m." on a Friday afternoon, when one juror had to leave at 5:00 p.m. that day. (Doc. 83 at 14). Plaintiff also argues the jury was coerced into reaching a verdict because the jurors had been informed on Monday that the trial was only estimated to last three days, and the trial was then in its fifth day. She relies on case law discussing the "significant risk that a verdict may result from pressures inherent in the situation rather than the considered judgment of all the jurors" when the trial judge "fails to discharge a jury which is unable to reach a verdict after protracted and exhausting deliberations." (*Id.* (quoting *Arizona v. Washington*, 434 U.S. 497, 509 (1978).)

A verdict must be unanimous unless the parties stipulate otherwise. Fed. R. Civ. P. 48(b). If a jury poll "reveals a lack of unanimity. . . , the court may direct the jury to deliberate further or may order a new trial." Fed. R. Civ. P. 48(c). If there is a lack of unanimity, the trial court must exercise its discretion to "assess whether the jury can reach a just verdict if it continues to deliberate." *Rayford v. Ill. Cent. R.R.*, 489 F. App'x 1, 7 (6th Cir. 2012) (quoting *In re Ford*, 987 F.2d 334, 339 (6th Cir. 1992)); *see also* 9B Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2493 (3d ed. 2016) ("Rule 48(c)'s lack of explicit guidance as to the correct method implies judicial discretion in this matter . . . ."). Sixth Circuit precedent does not require a trial court to declare a mistrial every time a juror dissents from a verdict. *Bhat v. Univ. of Cincinnati*, 23 Fed. App'x 280, 288 (6th Cir. 2001) (citing *Grossheim v. Freightliner Corp.*, 974 F.2d 745 (6th Cir. 1992)).

Factors relevant to determining whether a mistrial was appropriate include:

> (1) a timely objection by the defendant; (2) the jury's collective opinion that it cannot agree on a verdict; (3) the length of the jury deliberations; (4) the length of the trial; (5) the complexity of the issues presented to the jury; (6) any proper communication which the judge has with the jury; (7) the effects of possible exhaustion and the impact which coercion of further deliberations might have on the verdict; and (8) the trial judge's belief that additional [trials] will result in continued hung juries.

*Jones v. Hogg*, 732 F.2d 53, 56 (6th Cir. 1984) (citing *Rogers v. United States,* 609 F.2d 1315, 1317 (9th Cir. 1979)). For example, a trial court did not abuse its discretion in declaring a mistrial in a civil case in which the jury had deliberated for two and a half days after a six-day trial, during which time the jury twice reported it was deadlocked and the judge twice gave a modified *Allen* charge; and when the jury did return a verdict, one juror indicated both during polling and in questioning outside the presence of the other jurors that she was uncomfortable with the verdict but agreed with it so she could go home, stating that it was not her verdict but a compromise. *Grossheim*, 974 F.2d at 747–49, 752–53. A trial court also did not abuse its discretion in declaring a mistrial in a criminal case for an escape violation when the jury deliberated for five hours on only three hours of testimony and argument, and when the case should have been simple because the key elements of the crime were "capable of objective demonstration." *United States v. Capozzi*, 723 F.3d 720, 728 (6th Cir. 2013) (quoting *United States v. Bailey*, 444 U.S. 394, 417 (1980)). A mistrial was not required, by contrast, when, among other things, the jury sent the trial court notes asking about the possibility of an impasse and indicating that one juror was refusing to deliberate. *Bhat*, 23 Fed. App'x at 282–89.

Plaintiff's coercion argument does not have merit. The jury's deliberations in this matter were neither "protracted" nor "exhausting." The case went to the jury shortly before 4:50 p.m. on Thursday after four days of testimony and argument. The jury elected to begin its deliberations the next morning and began deliberating at 9:10 a.m. on Friday. The jury

26

deliberated for approximately three hours before lunch and less than two and a half hours after lunch, after which it returned its first verdict for Defendant. The jury was sent back to continue deliberations at 3:30 p.m. after two of the jurors stated "no" when polled. Fifteen minutes after being asked to return to its deliberations, and an hour and a quarter before the jury would have been excused for the day, the jury returned its second verdict in favor of Defendant. The jury was polled again. Based on their experience less than half an hour before, all the jurors must have known that all they had to do if they did not agree with the verdict was to say so during the second poll. Nevertheless, all twelve jurors stated that this verdict was their verdict. All of this took place before 4:00 p.m., after less than six hours of deliberations.

No juror in this case ever indicated the jury was deadlocked. No juror claimed that any jurors were refusing to deliberate, or even asked any questions about what would happen if the jurors could not agree. Nor were the jury's deliberations of less than a day "protracted" in relation to the four days of evidence and argument and the complex issues the jury was asked to decide.

The Court is firmly convinced that asking the jury to continue deliberating after two jurors expressed their dissent during the first poll was not an abuse of its discretion. *See Bhat*, 23 Fed. App'x at 282–89 (mistrial not required when one juror disagreed with initial verdict during polling). In fact, the Court dares say that if it had done otherwise—if it had declared a mistrial after less than a day of deliberations on four days of testimony regarding an alleged unconstitutional search of a young girl's body, without any indication from the jury that it was deadlocked—*that* might well have been an abuse of its discretion. Plaintiff is not entitled to a new trial on these grounds.

**IV.** **CONCLUSION**

The Court concludes that the trial was not unfair to Plaintiff and the jury did not reach a seriously erroneous result. *See Mike's Train House*, 472 F.3d at 405. There was no error in the jury instructions that impaired Plaintiff's theory of the case, the exclusion of the Tennessee Guidelines themselves did not affect Plaintiff's substantial rights, and the Court did not abuse its discretion in sending the jury back for additional deliberations. Accordingly, the Court will **DENY** Plaintiff's motion for a new trial (Doc. 83).

**An appropriate Order will enter.**

**/s/**_____
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**